GPS/jrl            02918-341-ROBB            Attorney No. 13507

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| BRIAN MORRIS, JAMES HARRIS, GENTILE TABOR, and MARCUS WASHINGTON, <br><br> Plaintiffs, <br><br> vs. <br><br> VILLAGE OF ROBBINS, a municipality, ROBBINS CHIEF OF POLICE JOHNNY HOLMES, in his official capacity and his individual capacity; ROBBINS POLICE OFFICER CARL SCOTT, Star No. 358, in his official capacity and his individual capacity; ROBBINS POLICE OFFICER DION KIMBLE, Star No. 323 in his official capacity and his individual capacity; ROBBINS POLICE OFFICER ANTHONY HOSEY, Star No. 311, in his official capacity and his individual capacity, ROBBINS POLICE OFFICER TYRUS LESTER, Star No. 703, in his official capacity and his individual capacity, <br><br> Defendants. | Case No.: 01 C 6799 <br><br> Judge Manning <br><br> Magistrate Judge Levin |

DOCKETED JUN 1 3 2003

FILED JUN 0 6 2003 MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT

## NOTICE OF FILING

TO:    Michael J. Levinsohn
        Holzman & Levinsohn
        116 South Michigan Avenue
        8th Floor
        Chicago, Illinois 60603



PLEASE TAKE NOTICE that on the 6th day of June, 2003, we filed with the United States District Court for the Northern District of Illinois, the attached Defendants' Memorandum of Law in Support of Motion for Summary Judgment.

Bollinger, Ruberry & Garvey
500 West Madison Street, Suite 2300
Chicago, Illinois 60661
(312) 466-8000

## CERTIFICATE OF SERVICE

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, I, Joann R. Leaming, a non-attorney, on oath certify that the statements set forth in this instrument are true and correct and that I served a copy of Defendants' Memorandum of Law In Support of Motion for Summary Judgment, on counsel of record as listed above, via U.S. Mail, on or before 5:00 p.m., on June 6, 2003.

Joann R. Leaming

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN MORRIS, JAMES HARRIS, GENTILE TABOR, and MARCUS WASHINGTON, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No.: 01 C 6799 |
| VILLAGE OF ROBBINS, a municipality, ROBBINS CHIEF OF POLICE JOHNNY HOLMES, in his official capacity and his individual capacity; ROBBINS POLICE OFFICER CARL SCOTT, Star No. 358, in his official capacity and his individual capacity; ROBBINS POLICE OFFICER DION KIMBLE, Star No. 323 in his official capacity and his individual capacity; ROBBINS POLICE OFFICER ANTHONY HOSEY, Star No. 311, in his official capacity and his individual capacity, ROBBINS POLICE OFFICER TYRUS LESTER, Star No. 703, in his official capacity and his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Manning  Magistrate Judge Levin |
| Defendants. | ) | |

FILED JUN 0 6 2003 MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**NOW COMES** Defendants, Village of Robbins ("Robbins"), Robbins Chief of Police Johnny Holmes ("Chief Holmes"), and Robbins Police Officers Carl Scott ("Scott"), Dion Kimble ("Kimble"), Anthony Hosey ("Hosey") and Tyrus Lester ("Lester") by their attorneys, Bollinger, Ruberry & Garvey, and provide their Memorandum in Support of Motion for Summary Judgment as follows:



## Introduction[1]

Plaintiffs in the captioned litigation have filed suit against the Robbins, its police chief and four of its officers relative to an incident occurring on December 16, 1999. At approximately 10:00 p.m. on the referenced evening, the four plaintiffs were in a tan-colored Nissan Maxima automobile parked at a public housing project located at 139th Street and Grace Street, Robbins. Brian Morris was the operator of the vehicle and James Harris was in the front passenger seat. It seems that Gentile Tabor was in the rear passenger seat behind Morris while Marcus Washington was in the rear passenger seat behind Harris.[2]

Sometime earlier that evening, Chief Johnny Holmes received a call of suspected drug-dealing activities at the area of 139th Street and Grace Street, Robbins. An anonymous caller phoned Police Chief Holmes and informed him of what the caller suspected was drug-dealing activities from automobiles parked in that immediate area. Following this report, Chief Holmes (in plain clothes) proceeded to drive through the area in an unmarked police vehicle. While driving through the area, Chief Holmes noticed two vehicles, one answering the description of the vehicle occupied by plaintiffs, with multiple mail individuals in each vehicle. Chief Holmes found this activity to be suspect as the area has a highly infectious drug activity problem. In fact, the area has a significant gang problem and it is common for individuals to sell drugs from automobiles. As such, Chief Holmes encountered a circumstance of four individuals parked

---

[1]This summation is based upon testimony of parties as referenced in Defendants' Rule 56 Statement, accompanying this Memorandum.

[2]The vehicle was actually owned by the mother of Gentile Tabor. It appears that Morris was the operator of the vehicle as Tabor's license was invalid surrounding the time of the incident at issue.

outside of a public housing project in Robbins late on a winter evening sitting parked in a known gang infested area and an area with a significant problem of individuals selling drugs from vehicles.

Knowing that Officers Scott, Kimble, Hosey and Lester were on a tactical unit detail at a trailer court park in Robbins, Chief Holmes proceeded to his fellow officers' location in order to have those officers investigate the circumstances observed by Chief Holmes. At that location, Chief Holmes apprised Kimble of what Chief Holmes had observed at the area of 139th Street and Grace Street. He apprised Kimble of the phone call which Chief Holmes had received and, further, that Chief Holmes had proceeded through the area and observed what he believes to have been drug-dealing activity from automobiles.

The individual officers that evening were in a van owned by Kimble as other covert cars were not available. Kimble had never previously used that vehicle for police purposes. Use of that vehicle was approved by Chief Holmes. Hosey drove the van with Kimble in the front passenger seat. Scott was seated on a bench seat in the middle of the van while Lester was on a bench seat in the far rear of the van. Lester was occupying that seat so that he had room to adjust a brace on an injured ankle.

The van proceeded south on Grace Street where the officers observed the tan-colored Nissan Maxima as described by Chief Holmes. Kimble indicated for Hosey to proceed over to the area of the tan Nissan Maxima. There is some dispute as to exactly how close the van came to the Nissan Maxima but it pulled up near the automobile and Officers Hosey, Scott and Kimble exited the van and identified themselves as police officers. Lester was not immediately able to exit the van as the rear passenger sliding door to the van shut while Lester was attempting to exit

3

the vehicle and the van door lacked a interior door handle. Thus, Lester had to exit the vehicle by climbing over the front passenger seat of the van, with an injured ankle, and exiting through that front passenger door. In fact, the incident at issue was over by the time Lester even exited the van.

Morris acknowledged that the windows to the Nissan Maxima were up (not surprising due to the fact that it was late in the evening on a winter night) and the car radio was on. Upon seeing the officers, Morris acknowledges that he commenced to leave the area, although the speed at which he did so is in dispute. However, Harris testified as to the rapid acceleration of the automobile. It is undisputed that he operated his vehicle in a forward direction and then to the left to head in southerly direction down Grace Street.[3]

Following the occurrence, Morris was transported by paramedics to an area hospital and, eventually, Defendants Harris and Tabor was placed into custody while this matter was investigated.

## ARGUMENT

### Plaintiffs Have Failed To Establish A Cause of Action Against The Village of Robbins

For the sake of simplicity, this Memorandum will address each claim in the order asserted by Plaintiffs in their Complaint. *See*, Complaint, Motion Exhibit "A". Defendants deny all

---

[3]There is further dispute as to who actually accelerated the vehicle. Morris testified that it was only he, at all times, who accelerated the vehicle that evening. James Harris testified that immediately after the shooting, he stuck his foot over the hump for the transmission and placed his foot either directly on the accelerator pedal or directly over Morris' foot on the accelerator pedal and Harris then accelerated the vehicle from the scene. A third version of the acceleration of the vehicle was provided by Harris evening of the incident. To investigate the shooting, Police Chief Holmes contacted the Illinois State Police Public Integrity Task Force. Members of that task force interviewed James Harris and reported that Mr. Harris, in fact, placed his foot over the hump of the transmission of the vehicle and accelerated the vehicle *prior* to the shooting incident. No matter the circumstance, the vehicle, in fact, proceeded forward in a direction at Officer Scott.

substantive allegations of the Complaint. *See*, Answer and Affirmative Defenses, Motion Exhibit "B".

Count I attempts to assert an action against Robbins. Plaintiffs allege that Robbins officially sanctioned, approved or authorized unconstitutional polices instituted by its police department (Complaint, ¶21). The Complaint alleges that Robbins through its polices, practices and customs caused plaintiffs to suffer unconstitutional deprivation of liberty and equal protection and that Robbins thereby exhibited deliberate indifference towards plaintiffs in regard to failing to supervise and train its employees (Complaint at ¶22). The Complaint further alleges that Robbins had actual knowledge that the Officers were not properly trained, were using unjustified deadly force and were making arrests without probable cause and its officers were filing false criminal charges (Complaint at ¶23).

In attempting to establish municipal liability under 42 U.S.C. §1983, plaintiffs are required to evidence that the purported constitutional rights were violated as a result of a policy or custom of Robbins. *See, Monell v. Department of Social Services*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 2035-2036 (1978) ("Monell"). In *Monell* the United States Supreme Court held that municipalities are "persons" subject to damages liability under §1983 where "action pursuant to official municipal policy of some nature cause[s] a constitutional tort". *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. The Supreme Court made clear that the municipality itself must cause the constitutional deprivation and that a municipality may not be vicariously liable for purported unconstitutional acts of its employees under the theory of *respondeat superior*.

A §1983 plaintiff may establish municipal liability in one of three ways. First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant

5

to a formal governmental policy or a "long-standing practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." See, *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 2723 (1989). Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official governmental policy. See, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-481, 106 S.Ct. 1292-1298, 1299 (1986). Whether a particular official has final policy-making authority is a question of state law. *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision of action and the basis for it. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-124, 108 S.Ct. 915, 924 (1988).

Plaintiffs have failed to produce any evidence of an official policy or custom of Robbins which would have laid basis for any purported claim of constitutional deprivation. Nor have they presented any evidence of long standing practice or custom which would have constituted the "standard operating procedure" of Robbins as to any alleged constitutional violation. As such, plaintiffs have failed to establish a *Monell* claim against Robbins under this theory of liability. Also, plaintiffs have failed to establish that any individual committing any purported constitutional tort against plaintiffs was an official with "final policy-making authority" as to Robbins. One cannot assume that even the Chief of Police possesses such authority absent evidence to that effect. Especially, when a municipality has in effect a board of police commissioners as does Robbins. Plaintiffs have failed to establish a *Monell* claim under this theory.

Further, there is no evidence of "ratification" of any purported unconstitutional conduct. Municipal liability under §1983 attaches only where a "deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483-484, 106 S.Ct. at 1300 (plurality opinion).

There is absolutely no evidence of improper training or improper supervision by Robbins of its police officers. There is no evidence that any purportedly unconstitutional conduct of any of the department officers was "ratified" by any individual with final policy-making authority on behalf of Robbins. In fact, the shooting at issue in the instant litigation was investigated by the Illinois State Police Public Integrity Unit Task Force, at the request of Chief Holmes. That investigation absolved the officers of any improper conduct relative to Officer Scott's discharge of a single round from his weapon at the vehicle occupied by plaintiffs and which struck plaintiff Morris, the operator of the vehicle driven at Scott. Plaintiffs have, likewise, failed to establish a *Monell* claim under this theory.

As such, the record is devoid of evidence which would have allow plaintiffs to proceed to trial relative to a *Monell* claim against Robbins. Assuming, *arguendo*, there was some type of unconstitutional discretionary action at issue, such actions of municipal employees are not chargeable to the municipality under §1983. To allow such a claim to proceed to trial absent the necessary elements would result in *Monell* claims being indistinguishable from *respondeat superior* liability. *See, Praprotnik*, 485 U.S. at 126, 108 S.Ct. at 926.

## Plaintiffs Have Failed As A Matter Of Law To Establish
## A Claim Against Village of Robbins Police Chief Johnny Holmes

The allegations against Chief Holmes asserted in Count II are as to his individual capacity only. *See*, Docket Entry of Minute Order, Motion Exhibit C. As plaintiffs have failed to establish evidence of a *Monell* claim against Robbins, plaintiffs have likewise failed to establish a similar such claim against Chief Holmes in his individual capacity. Plaintiffs have failed to evidence that Chief Holmes officially sanctioned, ordered, approved or authorized any unconstitutional policies, customs or usages of any officers of Robbins, let alone Officers Kimble, Hosey, Lester and Scott. (*See*, Complaint at ¶28). Further, there is no evidence that Chief Holmes had any knowledge that Officers were not "properly trained" and were using "unjustified deadly force" during the course of their employment with Robbins.

Chief Holmes was not even present during the incident at issue and there is no evidence of any prior complaints or discipline of the individual defendant officers as to any purported complaints of unconstitutional policies or practice in the course of their employment nor is there any evidence of any prior use of deadly force.[4] Further, it is Chief Holmes that, in fact, contacted the Illinois State Police Integrity Unit Task Force in order for that independent agency to investigate the circumstances of the shooting incident at issue and whether the use of deadly force was appropriate. As such, Chief Holmes is entitled to judgment as a matter of law as to Count II of the Complaint.

---

[4] It is only Officer Scott who engaged use of deadly force during the incident at issue in this litigation.

8

### Officers Kimble, Hosey, Lester And Scott Are Entitled to Judgment As A Matter Of Law

Count III of plaintiffs' Complaint is directed at the individual defendant officers as referenced above. Of initial note, Officers Kimble, Hosey and Lester never applied deadly force or any other type of significant force against any of the plaintiffs. For reasons set forth, Scott, Kimble, Hosey and Lester are also entitled to judgment as a matter of law in that plaintiffs have failed to establish a §1983 claim against these officers and the officers are entitled to qualified and good-faith immunities.

If a court determines in its ruling on a qualified immunity issue in a civil rights matter against a police officer that a favorable view of plaintiff's alleged facts show that the officer's conduct violated a constitutional right, the court's next step is to ask whether such right was clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad, general proposition. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001).

The inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is distinct from the inquiry on the merits of the excessive force claim; if an officer is mistaken regarding amount of force that is legal, but such mistake is reasonable, the officer is entitled to the immunity defense. *Saucier*, 533 U.S. at 205, 121 S.Ct. at 2158. That is, it is only after finding evidence of a constitutional violation that the court is then to proceed to the question whether this general prohibition of excessive force was the source for clearly established law that was contravened under the circumstances faced by the officer. The question is what the officer reasonably understood his powers and responsibilities to be when he acted,

under clearly established standards. *Saucier*, 533 U.S. at 207-208, 121 S.Ct. at 2159. In this instance, Officer Scott.

A police officer is constitutionally authorized to use deadly force where the officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others. Under such a scenario, it is not constitutionally unreasonable to prevent escape by the use of deadly force. *Tennessee v. Garner*, 47 U.S. 1, 105 S.Ct. 1694 (1985). A related legal principle is that the court must approach the question of use of excessive force from an objective angle. The Supreme Court has explained that the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him or her without regard to his or her underlying intent or motivation. Even an officer's evil intentions will not make a fourth amendment violation out of an objectively reasonable use of force. *Graham v. Connor*, 490 U.S. 386, 396-7, 109 S.Ct. 1685, 1872 (1989).

In *Graham*, a diabetic plaintiff brought a §1983 action for multiple injuries sustained when law enforcement officers used physical force against him during the course of an investigatory stop. While the Supreme Court noted that the test of reasonableness under the fourth amendment is not capable of precise definition or mechanical application, the Supreme Court noted, however, that particular attention must be made to the facts and circumstances of each case. These facts and circumstance include the severity of the suspected crime, whether the suspect posed an immediate threat to the safety of the officers or others and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense,

uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. at 396-7, 109 S.Ct. at 1872.

With this caution in mind, the circumstances of the present matter are analogous to those presented in the matter of *Scott v. Edinburgh*, 2002 WL 31455993 (M.D. ILL. 2002). In *Scott*, an off-duty police officer shot and killed a man who was trying to steal the officer's personal vehicle. The officer drove to a parking lot of a gas station and parked his car and left the keys in the ignition and walked to an adjacent hotdog stand. He then learned that an individual was trying to steal the officer's car. The officer ran back to his car, stopped about three to five feet directly behind the rear bumper. At one point in time, the officer could not see the decedent's hand as it appeared to be "digging or looking for something or perhaps turning the ignition of the car". The car's reverse lights came on and the car started to move back towards the officer who had to move in order to avoid being hit. Two to four seconds later, the car stopped backing up and immediately began driving forward.

Although there was dispute, the officer fired his weapon at the decedent sometime between the car stopping its rear movement and the car pulling forward away from the officer. *Scott* at p, 1. That is, the car had stopped moving towards the officer and had began to move in the opposition direction of the officer. In fact, plaintiffs in the *Scott* matter tried to make much out of this fact, the implication being that the officer was no longer in danger and could not have relied upon the self-defense rationale. The court stated that this argument overlooks the fact that all the events took place within a very small amount of time. Moreover, the court found that this rationale ignored the fact that not only had the officer been in fear for his own safety at one point,

11

but that there was fear for the safeties of others as well. These two rationales provided the basis for authority to use deadly force. *Scott* at p. 8.

In affirming summary judgment for the officer, the court in *Scott* specifically noted that, as in most such cases, the officer did not have time to engage in extensive rumination or to go through an elaborate decision making process but instead had to "react" based largely on instinct and training and having to do so with limited and imperfect information. *Scott* at p. 3, citing *Graham v. O'Connor*, 490 U.S. 386, 397 (1989). The court further found it extremely significant that the officer believed that the decedent was attempting to hit the officer with the car. In fact, the court stated, "this is really the most important fact of this case and the one that sets the stage for all that was to follow. Clearly, when used in this matter, a car is a deadly weapon analogous to a gun". *Scott* at p. 3, citing, *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("a car can be a deadly weapon"); *See also, Garvin v. Wheeler*, 304 F.3d 628 (7th Cir. 2002) ("It is objectively reasonable for a police officer to defend himself when a suspect aims a weapon at him").

Likewise, in the instant matter, definitive evidence places Officer Scott in the front of a vehicle operated by Morris. It is undeniable that the car accelerated forward, although the speed of that acceleration is in dispute. Plaintiff Harris did testify, as did the officers, as to rapid acceleration of the automobile.[5] However, it is undeniable that the car proceeded forward and that Scott reacted according to his training and that he jumped out of the way of the vehicle and

---

[5] The Scott decision does caution that speed of the vehicle is certainly not controlling as a slow moving vehicle is also deadly and, further, a driver can change direction and speed back towards an officer or civilian and into the automobile's path. This is especially significant in that each version of this incident has Defendant Officers, including Scott, very close to the automobile operated by Morris and the vehicle could easily change direction and speed.

12

fired a round at the driver, striking the operator of the vehicle, Morris. The *Scott* court also noted the officer's fear in that matter as it appeared that decedent was "digging" around in the front area of the car. Likewise, in the instant matter, Scott, Kimble and Hosey all testified as to the significant amount of movement inside the vehicle containing plaintiffs as the officers approached and announced their office. The obvious point is the apparent fear or threat that the movement is for a weapon.

Further, as in accordance with Scott, it is immaterial that Scott fired as the car sped alongside Scott. The sequence of the events did not allow Scott the ability to "engage in extensive rumination or to go through an elaborate decision making process" but instead required the officer to react based largely on instinct and training. *Scott* at p. 3, citing *Graham v. Connor*, 490 U.S. 386, 397 (1989). Further, Scott specifically testified as to the fact that he felt that his life was in danger and, further, even if the front of the vehicle had passed Scott by the time the gun fired, Scott was still concerned for the safety of others who may have been in the area. The rationale is that an officer believing that a car that had attempted to run the officer over to flee a scene will continue to be a danger to citizens and pedestrians who might cross paths with the fleeing vehicle. Knowing that Morris had already operated the car in a dangerous manner, how could Scott be sure that Morris did not pose a danger to others? As noted in the *Scott* decision, while it is true that no bystanders or pedestrians were injured or did not inadvertently wander into the car's path, this is something that could only have been known after the fact and through the luxury of hindsight. Split-second decisions by officers do not afford such luxury. *Scott* at p.6.

13

## Conclusion

Plaintiffs have failed as a matter of law to establish a *Monell* claim against the Village of Robbins. Likewise, the similar *Monell*-type allegations asserted against Chief Holmes in his individual capacity also fail as a matter of law.

The individual officers-Scott, Kimble, Hosey and Lester are also entitled to judgment as a matter of law. First, only one officer fired his weapon, Officer Scott. Second, the use of such force was constitutionally appropriate as Scott reasonably perceived his safety being threatened and he reasonable feared for the safety of others who might cross paths with the fleeing automobile operated by Morris. As such, each of these officers is entitled to judgment.

Respectfully submitted,

**VILLAGE OF ROBBINS, ROBBINS POLICE CHIEF HOLMES & ROBBINS POLICE OFFICERS SCOTT, KIMBLE, HOSEY & LESTER**

By: *[signature]*
One of Their Attorneys

14

George P. Smymiotis
Bollinger, Ruberry & Garvey, No. 13507
500 West Madison Street, Suite 2300
Chicago, Illinois 60661
(312) 466-8000